**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DEL-RIO SWINK**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. <u>4:25-cv-00569</u> |
| | ) | |
| | ) | |
| **BERKELEY POLICE OFFICER THOMAS** | ) | **JURY TRIAL DEMANDED** |
| **LOVE**, | ) | |
| in his individual capacity, | ) | |
| | ) | |
| **ST. LOUIS METROPOLITAN POLICE** | ) | |
| **OFFICERS ALFRED ALLMON,** | ) | |
| **TREVOR KREPPS, AND KRISTINE** | ) | |
| **STARK** | ) | |
| in their official capacities, | ) | |
| | ) | |
| **THE CITY OF ST. LOUIS, MISSOURI** | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **WALGREEN CO.**, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT**

1.     On November 4, 2022, Berkeley police officer Thomas Love and St. Louis

Metropolitan Police Department ("SLMPD") officers Alfred Allmon, Trevor Krepps, and

Kristine Stark violated Del-Rio Swink's rights under the Fourth Amendment, the Fourteenth

Amendment, and the Americans with Disabilities Act (the "ADA") while arresting and

transporting her to Barnes-Jewish Hospital ("BJC Hospital" or "BJC"). Ms. Swink is a disabled

breast cancer survivor suffering from peripheral neuropathy and degenerative joint disease. On

November 4, 2022, she went to Walgreens to pick up medication for a dental issue. During this

visit, Officer Love—working as a Walgreens security guard while off-duty from the City of

Berkeley Police Department—performed a takedown on Ms. Swink in the pharmacy waiting

area and dragged her across the floor while arresting her. Officer Love's needless, unreasonable,

and excessive force severely injured Ms. Swink's hips and back. SLMPD Officers Allmon,

Krepps, and Stark then failed to accommodate Ms. Swink's disabilities when transporting her to

BJC Hospital. Ms. Swink consequently experienced further pain and injury during the 'rough

ride' transport.

**PARTIES**

2.      Plaintiff Del-Rio Swink is a citizen of the United States of America and a resident

of St. Louis City, Missouri.

3.      Defendant Walgreen Co. is a corporation organized under the laws of the state of

Illinois and maintains its principal place of business in Deerfield, Illinois.

4.      Defendant Walgreen Co. transacts business in the state of Missouri and is the

owner of Walgreens Store No. 06472 located at 4218 Lindell Boulevard, St. Louis, MO 63108,

where the events giving rise to this complaint took place.

5.      Defendant Officer Thomas Love is a sworn peace officer employed by both the

City of Berkeley Police Department and Walgreen Co. All of Officer Love's actions set forth in

this Complaint were done under color of Missouri law. Officer Love is sued in his individual

capacity.

6.      Defendant Officer Allmon is a sworn peace officer employed by SLMPD. All of

Officer Allmon's actions set forth in this complaint were done under color of Missouri law.

Officer Allmon is sued in his official capacity.

7.     Defendant Officer Krepps is a sworn peace officer employed by SLMPD. All of Officer Krepps's actions set forth in this complaint were done under color of Missouri law. Officer Krepps is sued in his official capacity.

8.     Defendant Officer Stark is a sworn peace officer employed by SLMPD. All of Officer Starks's actions set forth in this complaint were done under color of Missouri law. Officer Stark is sued in her official capacity.

9.     Defendant City of St. Louis, Missouri, is a political and geographic subdivision of the State of Missouri and is organized as a constitutional charter city under Article VI, section 19 of the Missouri Constitution. The City is the public entity responsible for oversight of St. Louis Metropolitan Police Department.

## JURISDICTION AND VENUE

10.     This case is brought pursuant to 42 U.S.C. § 1983 and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq*.

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

12.     The incident giving rise to this suit occurred entirely within the Eastern Division of the Eastern District of Missouri.

13.     Each Defendant named in this suit resides or conducts business within the Eastern Division of the Eastern District of Missouri.

14.     As such, venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

15.     Ms. Swink is a breast cancer survivor in her mid-fifties diagnosed with peripheral neuropathy and degenerative joint disease. The peripheral neuropathy causes Ms. Swink severe

pain and limited mobility in her lower back and legs while the degenerative joint disease limits her mobility and causes pain in her right arm.

16.      Ms. Swink cannot lift her right arm, raise her legs, sit upright, lay down, or stand from a seated position without difficulty and/or pain due to her conditions.

17.      Ms. Swink's neuropathy and joint disease began in 2017 as a side effect of her breast cancer treatment.

18.      In March of 2022, Ms. Swink received a steroid injection in her back, which provided her with significant relief from the peripheral neuropathy pain.

19.      As such, Ms. Swink considered her neuropathy to be either resolved or much improved as of March of 2022.

20.      On November 4, 2022, Ms. Swink went to Walgreens Store No. 06472, located at 4281 Lindell Boulevard, to pick up prescription medication for a dental issue.

21.      While at the pharmacy service counter, Ms. Swink noticed a pharmacy clerk spitting sunflower seeds into a cup.

22.      Ms. Swink expressed displeasure at the clerk spitting in front of customers, and a short argument between the two ensued.

23.      The argument was resolved when the on-duty pharmacist intervened and helped Ms. Swink fill her prescription.

24.      Ms. Swink, having been helped, then took a seat in the waiting area to receive her medication.

25.      Ms. Swink and the clerk were no longer in conflict at this time, and Ms. Swink was sitting quietly waiting for her medication.

26.     Despite this, the clerk ordered Defendant Officer Love—an off-duty Berkeley police officer working at Walgreens as a security guard—to remove Ms. Swink from the store.

27.     When Officer Love approached Ms. Swink, she was seated quietly in the Walgreens pharmacy waiting area. All verbal conflict between Ms. Swink and the clerk had been resolved at this point.

28.     Officer Love told Ms. Swink that she was trespassing and would have to leave the store.

29.     Ms. Swink told Officer Love she was waiting for her medication and asked why she was being removed from the store.

30.     This caused Officer Love to become agitated and confrontational.

31.     Ms. Swink then asked Officer Love to show her his badge to properly identify himself, but he refused.

32.     Instead, he said he was "Officer Love with Berkeley" and showed Ms. Swink the back of his uniform, which read "POLICE" in bold lettering.

33.     When Ms. Swink then attempted to explain her brief argument with the clerk, Officer Love toppled her out of her chair and onto the floor.

34.     As soon as Officer Love touched Ms. Swink, she said "Don't put your hands on me, I'm disabled."

35.     At the time Officer Love toppled Ms. Swink out of her chair, Ms. Swink was not moving towards him, had not made any threats towards him, was not armed or holding any weapons, and had presented no physical threat towards the officer or any other individual.

36. Officer Love did not warn Ms. Swink that he was planning to use physical force before he grabbed her and removed her from the chair. In fact, Ms. Swink believed she was still in conversation with Officer Love discussing why she had to leave the store.

37. When Ms. Swink was pushed to the floor, she immediately felt extreme levels of pain radiating from her back and right hip.

38. Ms. Swink was unable to move or stand up without experiencing debilitating pain.

39. After shoving Ms. Swink to the floor, Officer Love said, "Now you're under arrest," and Ms. Swink responded, "Okay, I'll be under arrest."

40. Officer Love then attempted to handcuff Ms. Swink with her hands behind her back, and Ms. Swink again informed Officer Love that she was disabled and could not put her right arm behind her back.

41. Officer Love questioned Ms. Swink's claimed disability, so she clarified that since she suffered from peripheral neuropathy and degenerative joint disease she could not put her right arm behind her back.

42. In response, Officer Love began dragging Ms. Swink across the floor with no regard for Ms. Swink's problematic arm.

43. This was done in an apparent attempt to handcuff Ms. Swink with her hands in front of her body.

44. From the floor, Ms. Swink told Officer Love that her back and hip had been injured, that she was in extreme pain, and that she needed emergency medical assistance.

45. Officer Love ignored Ms. Swink's cries, continuing to drag her by the arms.

46. Officer Love was eventually able to handcuff Ms. Swink, but kept a hold on her arms while she was supine on the floor

47.     Officer Love only released Ms. Swink when a bystander verbally intervened, approaching and pointing at Officer Love until he dropped Ms. Swink's arms.

48.     While this was occurring, SLMPD was called at Officer Love's request.

49.     Officer Love stood over Ms. Swink, still supine on the floor of the pharmacy, handcuffed, and in severe pain until SLMPD officers arrived.

50.     While waiting for SLMPD to arrive Ms. Swink repeatedly asked Officer Love to help her off the floor and into a chair, but he ignored her.

51.     Ms. Swink cannot sit or lay down on hard surfaces without experiencing pain— even in an uninjured state—due to her peripheral neuropathy.

52.     As such, in her injured state Ms. Swink experienced the compounded and severe pain of her aggravated peripheral neuropathy, degenerative joint disease, and injuries while lying on the floor.

53.     SLMPD Officer Trevor Krepps was the first to arrive to Walgreens Store No. 06472 in response to Officer Love's call.

54.     Upon reaching the Walgreens Pharmacy area, Officer Krepps saw Ms. Swink handcuffed and supine on the floor and said "Okay first off, attitude. Done." While making a "cut it" gesture with his hand.

55.     Ms. Swink responded, "What attitude?" and Officer Krepps said "You know what attitude I'm talking about. We're done with that, okay? Cut the shit, sit up, sit in the chair."

56.     Ms. Swink then informed Officer Krepps that she would need help getting up, and he would have to be gentle.

57.     Before she could explain that her disabilities were the reason he would need to be careful, Officer Krepps grabbed Ms. Swink by the forearm and yanked her off the ground.

58.     Ms. Swink immediately let out a cry of pain, exclaiming "Don't pull me hard, I have peripheral neuropathy!"

59.     Due to her disabilities and injuries, Ms. Swink could not find her footing while standing.

60.     This resulted in Officer Krepps bashing Ms. Swink against the chairs in the waiting area, as he held onto her forearm but did not help Ms. Swink stabilize herself once upright.

61.     Officer Krepps then pushed Ms. Swink into the waiting room chairs, saying "Okay, sit down," in a dismissive tone.

62.     Ms. Swink, desperate for her disabilities to be taken seriously, then told Officer Krepps "I have peripheral neuropathy, and I'm wearing a back brace."

63.     Officer Krepps ignored her statements, and began looking through Ms. Swink's purse and wallet to look for her ID, saying "You're under arrest right now, you got ID in here?"

64.     After being told she was under arrest, Ms. Swink asked Officer Krepps to call an ambulance "because [her] back was hurting from when [Officer Love] threw her on the floor."

65.     Officer Krepps responded, "you said you were fine until I said you were under arrest."

66.     Officer Krepps then received notification that Officers Alfred Allmon and Kristine Stark were on their way, so he walked to the front entrance of Walgreens to meet them, asking Officer Love to "hang out with [Ms. Swink] for a second" while he stepped out.

67.     When Officers Allmon and Stark arrived, Officer Krepps lead them back to the pharmacy area where Ms. Swink and Officer Love were waiting. (Officers Krepps, Allmon, and Stark are hereinafter collectively referred to as the "SLMPD Officers.")

68.     After a conversation between Ms. Swink, Officer Love, and the SLMPD Officers wherein the SLMPD Officers were consistently rude and belittling to Ms. Swink, she was led off the premises without resistance.

69.     Ms. Swink was unable to walk without limping due to her injuries, which were aggravated by her disabilities.

70.     The SLMPD Officers did not acknowledge Ms. Swink's slowed pace or limp while walking her out.

71.     Consequently, Ms. Swink had to pause mid-walk to tell the SLMPD Officers "wait a minute, I have peripheral neuropathy slow down."

72.     Officer Krepps responded by saying "You gotta walk, let's go."

73.     After being led out of Walgreens, Ms. Swink again requested that the SLMPD Officers call an ambulance as she was in extreme pain and her back and hips were badly injured from being pushed and dragged across the floor, but they refused.

74.     Instead, the SLMPD Officers insisted—over Ms. Swink's protests—that they would transport her to BJC Hospital.

75.     Officer Allmon's police van was parked right outside the Walgreens entrance.

76.     The SLMPD Officers led Ms. Swink to the van, and Officer Allmon unlocked the back doors.

77.     Officer Stark then ordered Ms. Swink to "step up" into the back of the van.

78.     Ms. Swink responded that she couldn't "step up" due to her peripheral neuropathy, which prevents her from raising her legs without pain.

79.     The SLMPD Officers ignored Ms. Swink's comment and did not help her get into the back of the van.

80. Ms. Swink was forced to load herself into the van by sitting down onto the floor of the van and scooting backwards to get further inside.

81. Once Ms. Swink was in the van, the SLMPD Officers slammed and locked the doors without ensuring Ms. Swink was properly seated on the benches or secured with a seatbelt.

82. Officer Allmon then got into the driver's seat of the van and sped towards BJC Hospital, turning quickly around corners and accelerating and stopping rapidly.

83. Ms. Swink could not stabilize herself in the back of the van given she was handcuffed, unsecured, injured, and has limited mobility due to her disabilities.

84. During the drive, Officer Allmon turned a corner especially quickly and Ms. Swink, unsecured and unable to stabilize herself, fell over in the back of the van—causing further injury and trauma to her back and hips.

85. From the back of the van, Ms. Swink told Officer Allmon that she had fallen and was injured.

86. Despite Ms. Swink's cries and her audible fall onto the floor, Officer Allmon neither responded nor slowed his driving.

87. Fearful of being tossed about and injured again, Ms. Swink scooted along the floor of the van, climbed back onto the bench, and backed herself up against the wall in an attempt to secure herself until they reached BJC.

88. Once at BJC, Officers Allmon and Stark unlocked the back of the van to unload Ms. Swink.

89. Ms. Swink, distrustful of the SLMPD Officers who had ignored her repeated disclosures that she was disabled and upset that she had been injured further during transport, attempted to exit the vehicle unassisted.

90.     In tears, Ms. Swink climbed off the bench and began scooting along the floor of the van to exit the vehicle.

91.     Ms. Swink got one foot on the ground outside the van and paused briefly before Officer Allmon ordered her to "put [her] other foot down."

92.     Ms. Swink, unable to move her legs without experiencing pain, said "I'll put the other foot down when I can. . . . I have peripheral neuropathy and degenerative joint disease."

93.     Officer Allmon responded, "You've said that like half a dozen times, but you're still going to have to put your foot down."

94.     Ms. Swink was able to successfully place her other foot onto the ground but, due to her pain, had to immediately sit down on the bumper of the van upon exiting the vehicle.

95.     She then requested a wheelchair because Officer Allmon had "tossed her around in the van," and the resulting injuries made standing and walking severely painful.

96.     Ms. Swink had to request a wheelchair three times before Officer Stark responded "Um, I don't do anything without a please."

97.     Ms. Swink, then said "please" and Officer Stark said, "There we go!" while walking away to get a wheelchair.

98.     As Officer Stark was getting a wheelchair, Officer Allmon forced Ms. Swink to stand from where she was seated on the bumper so he could close and lock the doors of the van.

99.     Ms. Swink could not stand properly due to pain, and was forced to stagger over to Officer Stark, who was standing near the BJC entrance with a wheelchair.

100.     When Officer Stark began wheeling Ms. Swink into intake, Officer Allmon yelled "Stark, let's go. You don't need to do all that, come on."

101.    When Officer Stark continued to assist Ms. Swink, Officer Allmon again yelled "Let's GO!" in a louder and more authoritative tone, before getting into the driver's seat of the van.

102.    Officer Stark gave Ms. Swink a citation for "general peace disturbance" before the SLMPD Officers departed, but ultimately, no charges were brought against her.

103.    The SLMPD Officers consistently made demeaning, belittling, and rude comments to Ms. Swink during the arrest, transport, and drop-off.

104.    Five days after this incident, on November 9, 2022, Ms. Swink filed a complaint with the St. Louis City Civilian Oversight Board regarding the way the SLMPD Officers treated her during the arrest and transport.

105.    Nearly two years later, on June 25, 2024, SLMPD's Department of Internal Affairs found that Ms. Swink's allegations were sustained, and she was notified that the officers involved would be disciplined.

106.    From November 4, 2022, onwards, the pain of Ms. Swink's peripheral neuropathy has worsened significantly. She regularly experiences severe pain in her back, hips, and legs, and has undergone intensive medical treatment in attempts to return her condition to the manageable state it was in prior to November 4, 2022.

107.    After the incident, Ms. Swink's right leg was covered in bruises from being thrown on the floor and tossed about in the back of the police van. Ms. Swink's right hip specifically felt as though it had been "hit by a sledgehammer."

108.    Sitting and standing caused Ms. Swink so much pain that she was unable to even use the toilet properly.

109.    The incident also caused Ms. Swink to develop intense anxiety, agoraphobia, and depression.

110.    It took days for Ms. Swink to work up the courage to leave her home after the incident.

111.    For years after the incident Ms. Swink would only leave her home to go to the doctor's office or pick up food from the grocery store.

112.    To this day Ms. Swink is undergoing routine therapy and medical treatment to manage the emotional turmoil and physical injuries brought on by the November 4, 2022 incident.

## CAUSES OF ACTION

### COUNT I
### EXCESSIVE FORCE IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS – COGNIZABLE UNDER 42 U.S.C. § 1983
### (Against Defendant Officer Love)

113.    Plaintiff incorporates by reference all allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

114.    During Ms. Swink's interactions with Defendant Officer Love she was passive, unarmed, non-threatening, did not physically resist Defendant Officer Love, and was not suspected of any serious or violent offense.

115.    Despite this, Defendant Officer Love physically toppled Ms. Swink out of her chair and onto the floor of the Walgreens pharmacy.

116.    Defendant Officer Love then proceeded to drag Ms. Swink across the floor of the pharmacy by her arms—her right arm being particularly sensitive due to degenerative joint disease.

117.    Defendant Officer Love continued to drag and otherwise manhandle Ms. Swink on the floor of the pharmacy despite her agreement to submit to arrest, her injuries, requests for aid, and cries of pain.

118.    Each of Defendant Officer Love's above stated actions constitute separate and unreasonable uses of force in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

119.    As a direct and proximate result of the excessive uses of force employed by Defendant Officer Love, Ms. Swink suffered lasting traumatic injuries to her back and hips.

120.    Defendant Officer Love's actions also caused Ms. Swink emotional suffering, bodily pain, fear, apprehension, depression, and anxiety.

121.    Ms. Swink has suffered and continues to suffer special damages in the form of medical expenses as a result of Defendant Officer Love's excessive uses of force.

122.    Defendant Officer Love's actions were intentional, wanton, malicious, oppressive, reckless, and callously indifferent to Ms. Swink's Constitutional rights.

123.    As such, Ms. Swink is entitled to punitive damages against Defendant Officer Love.

124.    Ms. Swink is further entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988 if her claims prevail.

**WHEREFORE**, Ms. Swink respectfully requests this Court enter judgment against Defendant Officer Love for compensatory damages in a fair and reasonable amount, and for punitive damages, plus the cost of this action, reasonable attorneys' fees, and any further relief this Court deems just.

## COUNT II

**FAILURE TO ACCOMMODATE DISABILITY DURING TRANSPORT IN VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT OF 1990 – COGNIZABLE UNDER 42 U.S.C. § 12131**
**(Against Defendant Officers Allmon, Krepps, and Stark and Defendant City of St. Louis)**

125.    Plaintiff incorporates by reference all allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

126.    Ms. Swink is a breast cancer survivor diagnosed with peripheral neuropathy and degenerative joint disease. These conditions cause pain and limit mobility in her lower back, legs, and right arm.

127.    Because of these conditions Ms. Swink often experiences pain while standing, sitting, laying down, and moving her right arm.

128.    Given the above stated conditions, Ms. Swink is a qualified individual with a disability within the context of the ADA. 42 U.S.C. § 12131(2).

129.    Police departments must abide by Title II of the ADA as they "fall squarely within the definition of 'public entity.'" *Gorman*, 152 F.3d at 912; 42 U.S.C. § 12131(1).

130.    Therefore, police departments cannot exclude or deny an individual from "the benefits of [their] services, programs, or activities" by virtue of their disability. 42 U.S.C. § 12132; *Gorman*, 152 F.3d at 912.

131.    Post-arrest transportation is a public service that must be completed according to the requirements of the ADA. *Gorman*, 152 F.3d at 912.

132.    After Ms. Swink was handcuffed and in custody, she informed all Defendant SLMPD Officers that she suffered from peripheral neuropathy and was severely injured in her back and hips.

133.    Ms. Swink further explained to Defendant SLMPD Officers that her peripheral neuropathy caused her pain and limited her mobility in her back and legs.

134.    Despite having actual knowledge of Ms. Swink's disabilities and injuries, Defendant SLMPD Officers failed to ensure that Ms. Swink was transported to the hospital in a manner that would not cause her needless additional pain and injury due to her disabilities.

135.    Indeed, each Defendant SLMPD Officer agreed to transport Ms. Swink in a police van fitted only with hard metal benches and lacking seatbelts or any other mechanism to ensure she was secure during transport.

136.    The Defendant SLMPD Officers placed Ms. Swink into the van, and Officer Allmon drove the van recklessly, taking Ms. Swink on a 'rough ride' to BJC Hospital.

137.    Due to Defendant SLMPD Officers' failure to accommodate Ms. Swink's disabilities during transportation, Ms. Swink fell over in the back of the police van—causing further injury to her back, hips, and legs.

138.    Despite Ms. Swink's cries of pain and audible fall, Defendant Officer Allmon did not slow his driving, stop the van, or communicate with her in any way.

139.    Thus, Defendant SLMPD Officers deliberately and knowingly failed to accommodate Ms. Swink's disabilities and injuries when transporting her post-arrest.

140.    Had Ms. Swink been transported to BJC in a standard police car with cushioned seats and seatbelts and/or transported with a reasonable level of caution, she would not have suffered further injury.

141.    By failing to do so, Defendant SLMPD Officers denied Ms. Swink the benefit of being handled and transported in a safe and appropriate manner consistent with her disability. *Id.* at 913.

142.    At the time of the arrest, policymakers in the City of St. Louis were on notice that SLMPD Officers used police vans to transport arrestees regardless of their potential disabilities.

143.     Despite this knowledge, on information and belief, policymakers in the City of St. Louis failed to create any practices, guidance, or customs that would allow for alternate means of transport when an arrestee has a disability.

144.     Defendant SLMPD Officers' failure to accommodate Ms. Swink's disabilities and injuries during transportation violated her rights under Title II of the ADA.

145.     As a direct and proximate result of Defendant SLMPD Officers' failures, Ms. Swink suffered lasting traumatic injuries to her back and hips.

146.     Defendant SLMPD Officers' inactions also caused Ms. Swink emotional suffering, bodily pain, fear, apprehension, depression, and anxiety.

**WHEREFORE,** Ms. Swink respectfully requests this Court enter judgment against Defendant SLMPD Officers Alfred Allmon, Kristen Stark, and Trevor Krepps for compensatory damages in a fair and reasonable amount, plus the cost of this action, reasonable attorneys' fees, and any further relief this Court deems just.

## COUNT III
## NEGLIGENCE – COGNIZABLE UNDER MISSOURI COMMON LAW
### (Against Defendant Officer Love)

147.     Plaintiff incorporates by reference all allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

148.     On November 4, 2022, Ms. Swink was a patron and customer of Walgreens.

149.     At all times relevant to the allegations of this Complaint, Defendant Officer Love was working for Walgreens as a security guard while off-duty from Berkeley Police Department.

150.     Therefore, Defendant Officer Love had a general duty to exercise reasonable care to prevent foreseeable harm to Ms. Swink, a Walgreens patron, while arresting her. *Chavez v. Cedar Fair, LP*, 450 S.W.3d 291 (Mo. banc 2014).

151.   Defendant Officer Love breached that duty by using undue and excessive force on Ms. Swink during the attempted arrest.

152.   Defendant Officer Love unreasonably ignored Ms. Swink's lack of resistance and unthreatening demeanor when he decided to use force against her.

153.   Defendant Officer Love further failed to exercise reasonable care when he toppled Ms. Swink out of her chair, dragged her across the floor, and generally manhandled her while attempting to arrest her.

154.   Notably, Defendant Officer Love continued to drag and manhandle Ms. Swink on the floor even after she had verbally agreed to submit to arrest.

155.   A reasonably prudent security guard in Defendant Officer Love's position would not have thrown Ms. Swink to the floor and would not have ignored Ms. Swink's verbal agreement to submit to arrest.

156.   By throwing Ms. Swink to the ground and continuing to apply force after she expressed compliance, Defendant Officer Love acted maliciously and in bad faith with the intent to injure Ms. Swink.

157.   Defendant Officer Love's unreasonable actions constituted a breach of his duty to exercise reasonable care to prevent foreseeable harm to Ms. Swink during her arrest.

158.   Defendant Love's breach of duty was the direct and proximate cause of the traumatic and lasting injuries to Ms. Swink's back and hips.

159.   The risks of Defendant Officer Love's negligent use of force were foreseeable, as Defendant Officer Love could have anticipated that throwing a woman in her mid-fifties onto a hard tile floor would have caused her physical injury—particularly to her hips and back.

160.    The types of injuries sustained by Ms. Swink are well within the scope of injuries risked by Defendant Officer Love's unreasonable uses of force.

161.    To this day, Ms. Swink is still suffering from the aftereffects of the traumatic injuries Defendant Officer Love inflicted on her hips and back.

162.    Defendant Officer Love's unreasonable actions also caused Ms. Swink emotional suffering, bodily pain, fear, apprehension, depression, and anxiety.

**WHEREFORE,** Ms. Swink respectfully requests this Court enter judgment in favor of Ms. Swink and against Defendant Love for compensatory damages in a fair and reasonable amount, and any further relief this Court deems just.

## <u>COUNT IV</u>
## NEGLIGENCE – COGNIZABLE UNDER THE DOCTRINE OF *RESPONDEAT SUPERIOR*
### (Against Defendant Walgreen Co.)

1.    Plaintiff incorporates by reference all allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

2.    At all times relevant to the allegations of this Complaint, Defendant Officer Love was acting as an employee or agent of Walgreen Co.

3.    As a security guard hired by Walgreen Co., Defendant Officer Love was responsible for interacting with members of the public and arresting customers suspected of committing crimes at Walgreens in order to effectively protect the property and merchandise of the store.

4.    Defendant Walgreen Co. has a business interest in its security guards removing individuals from its stores when requested by Walgreens employees.

5.    On November 4, 2022, a Walgreens pharmacy clerk explicitly ordered Defendant Officer Love to remove Ms. Swink from the store.

6.     Defendant Officer Love was therefore acting in furtherance of Walgreen Co.'s business when attempting to arrest Ms. Swink.

7.     As such, Defendant Officer Love was acting within the scope and course of his employment as security guard for Walgreen Co. when he attempted to arrest Ms. Swink.

8.     Defendant Walgreen Co. expected Defendant Officer Love to use physical force to remove patrons from the store, when necessary, given his position as a security guard.

9.     Defendant Walgreen Co. also expected Defendant Officer Love to arrest patrons within Walgreens stores, when necessary, given his position as a security guard.

10.     It was therefore foreseeable to Defendant Walgreen Co. that a negligent use of force by Defendant Officer Love may cause harm and physical injury to Walgreens patrons such as Ms. Swink.

11.     Defendant Officer Love did in fact negligently and unreasonably injure Ms. Swink during the attempted arrest by knocking her to the ground and dragging her across the floor even though she verbally agreed to be arrested.

12.     As a result of Defendant Officer Love's negligence, Ms. Swink suffered lasting traumatic injuries to her back and hips.

13.     Because Defendant Officer Love negligently injured Ms. Swink within the scope and course of his employment at Walgreens, Defendant Walgreen Co. is liable for the injuries caused by Defendant Officer Love's negligence under the doctrine of *respondeat superior*.

**WHEREFORE,** Plaintiff respectfully requests this Court enter judgment in favor of Ms. Swink and against Defendant Walgreen Co. as jointly and severally liable for compensatory damages in a fair and reasonable amount, and any further relief this Court deems just.

**Dated**: April 24, 2025                    Respectfully submitted,

                              **ARCHCITY DEFENDERS, INC.**

                              */s/ Ebony A. McKeever*
                              Maureen Hanlon, #70990MO
                              Ebony McKeever, #15752IA
                              440 N. 4th Street, Suite 390
                              Saint Louis, MO 63102
                              855-724-2489
                              314-925-1307 (fax)
                              mhanlon@archcitydefenders.org
                              emckeever@archcitydefenders.org

                              *Attorneys for the Plaintiff*